FILED
2009 MAY 18 P 4:03
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| ROBERT J. WEICHEY, JR. and | : | Case No. 08-26098-TPA |
| DEBRA L. SHAY-WEICHEY, | : | Chapter 13 |
| *Debtors* | : | |
| ROBERT J. WEICHEY, JR. and | : | |
| DEBRA L. SHAY-WEICHEY, | : | |
| *Plaintiffs,* | : | |
| | : | Adversary No. 08-2480-TPA |
| v. | : | |
| NEXTIER BANK, N.A., and | : | |
| RONDA J. WINNECOUR, | : | |
| Chapter 13 Trustee, | : | |
| *Defendants.* | : | |

*Appearances:*  Dai Rosenblum, Esq., for the Plaintiffs
Jodi L. Hause, Esq., for NexTier Bank, N.A.

## MEMORANDUM OPINION

On May 11, 2009, trial on the Debtors', Robert J. Weichey, Jr. And Debra L. Shay-Weichey, **Complaint to Determine Secured Status** ("Complaint") filed in the above matter at Document No. 1, took place. In the *Complaint* the Debtors requested the Court to strip the lien of the Defendant's second mortgage from their residence located in Butler, Pennsylvania which residence they alleged held a value of $127,000. In its Answer, the Defendant NexTier Bank, N.A. ("NexTier"), holder of the second mortgage on the premises, claimed the value of the Debtor's residence to be approximately $224,000.[1]

---

[1] The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. §157(b)(2)(B), (K)* and *(O)*.

1

Prior to trial, the Parties stipulated that the only issue to be determined by the Court was "one of valuation" of the property subject to NexTier's mortgage lien. This was in recognition of the fact that the payoff amount of the first mortgage against the Debtor's property and in favor of U.S. Bank, N.A. ("U.S. Bank"), totaled $186,182.62 as of the date the Chapter 13 bankruptcy was filed. *See Complaint* at ¶7; *Answer* at ¶7. The Parties also agreed the only witnesses necessary for trial were the appraisers for each side. The respective appraisals prepared by each expert witness, which were intended to be used and referenced by the Court in rendering its decision, were admitted into evidence without objection.[2] Likewise, the qualifications for each expert witness were stipulated to by the respective Parties.

## FACTS

The Debtors reside at 141 Rimp Road, Summit Township, Butler County, Pennsylvania ("Subject Property"). The residence is a 1 ½ story log cabin home located on a 1.31 acre lot. It has 7 rooms, including 3 bedrooms and 1 bathroom, and was constructed in 2005. NexTier holds a second mortgage on the Debtors' residence, with a secured position behind the first mortgage of U.S. Bank which filed a proof of claim in the amount of $186,182.62 in the main bankruptcy case. NexTier filed a proof of claim in the amount of $31,991.66. In this Adversary Proceeding the Debtors ask the Court to find, pursuant to *11 U.S.C. §506(a)*, that NexTier's claim is entirely unsecured because the value of the residence is less than the U.S. Bank claim. NexTier answered the *Complaint* by disputing the Debtors' contention as to the value of the residence,

---

[2] These Exhibits were identified as Exhibit "1" (offered by the Plaintiff) and Exhibit "A" (offered by the Defendant.)

asserting that its claim is entirely secured. After an opportunity for discovery, the Parties advised the Court that the only issue necessary for decision pertained to the value of the Subject Property, and as noted, trial solely on that issue occurred on May 11, 2009.

Also as noted, only two expert real estate appraisers testified at trial, one for each side. James Keffalas testified for the Debtors and Scott Karner for NexTier. As expected, the witnesses each expressed different opinions as to the value of the residence. Mr. Keffalas testified that at all relevant times, in his opinion, the home's value was $155,000 while Mr. Karner placed a value of $224,000 on it. At the close of the testimony, the Court advised the Parties that it would take the matter under advisement and thereafter render a decision, hence this *Memorandum Opinion* and accompanying *Order*. The Court will first briefly summarize the background and conclusions of each of the witnesses, and then turn to a discussion and decision.

*Testimony of James Keffalas*

Mr. Keffalas is a Pennsylvania-licensed Certified General Appraiser and also a licensed real estate broker with an office in Butler, Pa. He obtained his broker's license in 1978 and started conducting appraisals around that time. He has held his current appraisal license since 1991. Mr. Keffalas conducts between 150 and 350 appraisals per year. He testified that he has performed "thousands" of appraisals during his career. This is the first appraisal he has ever performed for the Debtors, although he has done "a few" appraisals previously at the request of their attorney. He testified that his active involvement in the sale of properties as a broker helps to give him insights that are useful in his appraisal work.

Mr. Keffalas conducted his appraisal on January 13, 2009.[3] He personally inspected the residence and characterized it as exhibiting telltale signs of being something of a work still in progress. He mentioned rough landscaping and unfinished trim as evidence of that status. He noted that the residence is located in a rural area and is serviced by well and septic system rather than public sewer and water. He also noted that the residence is serviced by propane, which he stated was a more expensive and less desirable fuel than natural gas. He also observed an openly visible structural separation of the upper gable sidewalls from the gable rafters. In terms of the general market conditions in the area of the residence, Mr. Keffalas testified that the supply of housing exceeded demand. It was his belief that real estate prices declined about 5-10 % in the year preceding the appraisal.

Mr. Keffalas testified that in his opinion the comparable sales approach was the most appropriate method to use for appraising the value of the residence. In recognition of the fact that the Subject Property is of log construction, which represents a distinct and rather limited segment of the overall housing market, Mr. Keffalas sought only log homes for the other comparable sales. The relative scarcity of this type of dwelling meant he had to look a little further afield than normal in finding comparable sales. He settled on three comparable sales (Pinehurst Rd., LaRay Dr., and Game Reserve Rd.), all log cabin homes that had sold in the previous year and all located in the same school district (Butler Area) as the Subject Property. One of these comparable sales is located

---

[3] The statute is silent as to the required timing of the valuation, merely stating that the "value shall be determined in light of the purpose of the valuation." *11 U.S.C. §506(a)*. Thus, it does not specify if the value is to be determined as of the date of the petition, the date of the plan confirmation, the date of the hearing, or perhaps some other date. Although the timing of the valuation could conceivably be significant in a time of a rapidly changing market, in this case neither side raised an issue as to timing. The Court therefore concludes that timing is not of significance in this case and it will proceed to determine the value of the property based on the evidence presented at trial without further consideration of the timing issue.

approximately 2 miles from the Debtors' residence, and the other two are 6-7 miles distant. Mr. Keffalas did drive-by viewings of the comparable sale properties, but did not otherwise personally inspect them, relying instead on public records and multi-list records to obtain information about them.

The three comparable sales selected by Mr. Keffalas sold at actual prices of between $151,560 and $239,000. He testified that he then went through a process of making various "adjustments" to the actual sales prices of each of the three comparable sales in order to address factors that distinguished them from the Subject Property. After those adjustments were made the adjusted sales price range of the comparable sales was from $98,060 to $174,500. Mr. Keffalas testified that his final value figure for the Subject Property was not simply an average of the adjusted sales prices of the three comparable sales, but rather, his best estimate of the likely sales price of the Subject Property given the range shown by the comparable sales.[4] He acknowledged that it was possible the Subject Property could sell for more than $155,000 but said it was a "stretch" to think it could sell for as much as $180,000.

*Testimony of Scott Karner*

Mr. Karner is a Pennsylvania-licensed Certified Residential Appraiser with an office located in Wexford, Pa. He began work in the appraisal field in 2002, starting out as an appraiser trainee. He continued in that capacity until January 2005, when he obtained his present license. He testified that he conducts between 500 and 600 appraisals per year and estimated that he has

---

[4] The Court notes that a strict mathematical averaging of the three, adjusted sales prices from the Keffalas appraisal produces a value of $148,686.

appraised about 35 to 45 log cabin homes during his career. He has conducted somewhere between 10 and 100 appraisals for NexTier.

Mr. Karner conducted his appraisal in late November 2008. He personally viewed the Subject Property on November 22, 2008, and reported finding it in "good" condition. He did not note any significant defects. Due to snow cover on the date of his inspection Mr. Karner was not able to observe the landscaping condition of the property. He testified that through research he determined that the relevant market where the Subject Property is located is "stable" and has not experienced a price decline in the year prior to the appraisal.[5]

Mr. Karner agreed that the comparable sales approach is the most appropriate method to use in this case to value the residence. He was also in agreement that the comparable sales to be chosen should also be log cabin homes, which makes the process somewhat more difficult than for more typical types of home because of the relative scarcity of log construction. He began his search for comparable sales in Summit Township but could find none there. He then expanded his search to the entire Butler Area School District and located three appropriate comparable sales in Center Township (LaRay Dr., 159 Spring Run Rd. and 197 Spring Run Rd.), all in close proximity to each other and all approximately 6 miles distant from the Subject Property.

---

[5] NexTier did not submit documentation of Mr. Karner's purported research on this topic into evidence. It did reference NexTier Exhibits B-E for cross examination purposes only in an attempt to call into question Mr. Keffalas's opinion that there has recently been a 5-10% price decline in the relevant market. These Exhibits were sales statistics for the market taken from a service known as RealStats. However, these Exhibits referenced an unexplained exclusion of all sales of under $80,000. There was no effort by NexTier to lay a foundation as to why the data should be considered as reliable and substantive evidence to show the market was stable. Consequently, the Court gives these Exhibits no weight.

The three comparable sales identified by Mr. Karner had actual sales prices of between $215,000 and $268,000. He too performed an adjustment to these actual prices and arrived at adjusted sales prices in the range of $219,00 to $234,800. Mr. Karner testified that the required methodology at that point was to determine which of the three comparable sales was the most similar to the Subject Property and to adopt that adjusted value as his appraised value. In this case, Mr. Karner determined that the most similar comparable sale was LaRay Dr. (which happens to be the only comparable sale property in common between the Keffalas and Karner appraisals). Its adjusted sales price was $223,800. Rounding that figure off, Mr. Karner arrived at his opinion of $224,000 as the value of the Debtors' residence.

## *DISCUSSION*

The Court finds reasons to question both of the appraisals in this case. Starting with Mr. Keffalas, a number of points were raised by counsel for NexTier in her cross-examination that do bear on the reliability of his appraisal. For instance, Mr. Keffalas showed the Pinehurst Rd. comparable sale as including a 3-car integral garage which led to a significant $9000 adjustment when compared with the Subject Property (which has no garage). However, photographs introduced by counsel for NexTier appear to show Pinehurst with only a 1-car integral garage. *See* NexTier Exhibits "F" and "G." Mr. Keffalas testified that he relied on the information in the multi-listing for the Pinehurst property in assuming the 3-car garage existed and the Court has no doubt that he did so in good faith. Nevertheless, this apparently misplaced reliance on the multi-list information affected the adjustment he made on that particular property. With respect to that same property, Mr. Keffalas also acknowledged on cross-examination that it had been the subject of a sheriff sale in

November 2007, although that was not disclosed in his appraisal report because he did not believe it to be significant for purposes of the appraisal. Counsel for NexTier suggested that the circumstance of the property being held and sold by a bank following a foreclosure could be of some relevance since the bank would possibly be motivated to sell the house more quickly and cheaply to recoup its investment. The Court finds that to be a fair point, although no effort was made by NexTier to quantify such factor.

A couple of other items concerning the Keffalas appraisal that the Court views as weaknesses are worth mentioning. First, Mr. Keffalas' testimony concerning a 5-10% price decline in the market over the preceding year was based solely on his own experience in reviewing Butler County, PA, multi-list sales data rather than a rigorous analysis of that data. The Court finds Mr. Keffalas's testimony on market pricing to be generally credible given the recent manifestly evident national real estate slump, although it would have been preferable for Mr. Keffalas to base an opinion on an analysis of the data rather than his own informal impression.[6] Second, Mr. Keffalas was less than clear as to exactly how he arrived at his final figure of $155,000 in light of the three adjusted comparable sale values. The Court was left with a general understanding in this regard, but it would have been more helpful if Mr. Keffalas had better explained his thought process in reaching the final figure based upon a reconciliation of the comparable sales data referenced in the appraisal.

Turning to the testimony of Mr. Karner, the Court finds more significant reasons to question his conclusion. First there were a number of acknowledged errors in his report concerning

---

[6] The Court accepts the witnesses' testimony that inclusion of such data in the Summary Appraisal Report is not required. Such data is only required in a Self Contained Appraisal Report.

the Subject Property itself. His report shows the property to be in an unzoned area when in fact it is in an R-1 residential zone. His report does not make mention of the gable defect, the unfinished trim work, or the unfinished landscaping on the Subject Property. When pressed on these points during cross-examination, Mr. Karner did not dispute that these conditions existed. He merely stated that, for whatever reason, he had not observed them during his inspection.

With respect to the gable defect, Mr. Karner testified that even if he had noticed it during his inspection it would not have had any effect on his valuation because he would not know the extent of the problem or the cost of repair. By contrast, Mr. Keffalas testified that even though he too lacked that information he believed the very existence of the defect would affect the value of the residence based on his experience with buyers. As a result Mr. Keffalas factored in a $3000 adjustment to account for the defect, an amount he termed as "conservative."

The Court finds the approach taken by Mr. Keffalas as to the gable defect to be the better one and much more credible. As to the unfinished landscaping, Mr. Karner can perhaps not be faulted for failing to make the observation given the snow cover when he inspected the property. Nevertheless, that does not change the fact that his valuation fails to consider that rather significant feature of the Debtors' property. When confronted with the issue at trial, he steadfastly refused to acknowledge the need for a further adjustment. Mr. Karner's testimony in this regard further damaged his overall credibility in the eyes of the Court.

Second, Mr. Karner also made some statements concerning his valuation methodology that the Court has a difficult time accepting. He could not testify as to whether the three comparable sales he used were served by public sewer and water as compared with the

9

septic/well system on the Subject Property, and stated that in any event, it did not matter because such a circumstance would not make a difference to potential buyers. Intuitively, such a comment is not credible to the Court. Furthermore, it was contradicted by testimony from Mr. Keffalas where he claimed that "city" water and sewer is much more desirable and does make a difference to prospective buyers. For that reason, Mr. Keffalas made a $6000 location adjustment to his LaRay Dr. comparable sale (the only one of his comparable sales with public sewer and water) whereas Mr. Karner made no such adjustment as to any of his comparable sales. Again, the Court finds the Keffalas conclusion on this issue to be more credible and the approach taken by him to be the better one.

Mr. Karner also stated that the fact that the Subject Property is served by bottled propane rather than natural gas has no bearing on its value. However, Mr. Keffalas credibly testified that propane is the most expensive home fuel source commonly available and that added cost is reflected in buyer preference for natural gas service when purchasing a home. Mr. Karner also acknowledged that all three of his comparable sales are located only a mile or so from a major shopping center, whereas the Subject Property is in a decidedly more rural setting. He nevertheless found no reason to make any adjustments for that disparity in setting/location, which the Court finds to be questionable. Admittedly, while some folks do prefer a more rural, country-living setting when purchasing a home, the Court's experience is that a premium is placed by the buying public on shopping and service accessibility related to a home's location.

Third, Mr. Karner, upon direct questioning by the Court, testified as to his understanding of the "industry standard' concerning how a residential appraisal using the comparable sales method is to be conducted. He stated that if there is one comparable sale that is

10

demonstrably closest to the Subject Property in relevant respects, its adjusted value *must* be used by the appraiser as the appraised valuation. The Court rejects that view and finds Mr. Karner's testimony on that point to lack credibility for a number of reasons. Such a result is logically inconsistent and makes little sense since it would then be pointless to proceed with the exercise of identifying and calculating an adjusted sales price for multiple comparable sales if only one is ultimately to be considered in formulating a value.

Mr. Karner's testimony in this regard also appears at odds with "USPAP" standards that both sides agreed were applicable.[7] The Court can find nothing in the *USPAP* standards to indicate that an appraiser must select one of the adjusted sales price values as asserted by Mr. Karner to be required. Rather, *USPAP* states that in developing a real property appraisal, the appraiser must "reconcile the quality and quantity of data available and analyzed within the approaches." *See USPAP Rule 1-6 (2008-09 Edition)*. This indicates that the appraiser's task is one of prudential judgement, weighing and considering all the data, rather than just mechanically selecting one of the values. As such, the Court finds that in this sense the appraisal process was more accurately characterized by Mr. Keffalas when he stressed that in many ways the appraisal process is often more "art than science" and calls for the appraiser to bring all relevant experience to bear in making the final judgment as to value. It is within the "range" of values created by the adjusted sales price process involving the comparable sales that the appraiser arrives at a value the appraiser believes appropriate for the Subject Property.

---

[7] *USPAP* is an acronym for the "Uniform Standards of Professional Appraisal Services" published by the Appraisal Foundation. Under Pennsylvania law, licensed appraisers are required to comply with *USPAP*. *See 49 Pa. Code §36.51*.

Finally, it follows from the previous point that the experience of an appraiser is undoubtedly of some significance. Both witnesses agreed to that component of the process in their testimony at trial. In that regard, it cannot be disputed that Mr. Keffalas has considerably more and broader experience than does Mr. Karner when it comes to appraisal work. Mr. Keffalas has been conducting appraisals for 31 years, and has been a licensed appraiser for 18 of those years versus seven years of appraisal work and four years of licensure for Mr. Karner. Mr. Keffalas has also been a licensed real estate broker for 31 years, which has undoubtedly given him much valuable "real life" experience concerning the desires and motivations of buyers that can be tapped into when making an appraisal. In making these comments the Court in no sense intends to disparage Mr. Karner, or to suggest that a more experienced appraiser will always be believed over a more junior colleague. The Court's observations in this regard is only meant to acknowledge that experience is a relevant consideration, and in this case, the level of experience tips decidedly in favor of the Debtors' expert appraisal as to value.

## *CONCLUSION*

The Court renders its decision in this matter keeping a number of things in mind. A debtor bears the burden of proof on the issue of valuation under *11 U.S.C. §506(a). In re Finnegan*, 358 B.R. 644, 649 (Bankr. M.D. Pa. 2006). For the reasons stated above, the Court finds that the Debtors have met their burden of proof. In this case, the comparable sales approach is the appropriate method for determining the value of the residence. Because the valuation process often involves an analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the witnesses.

*In re Patterson*, 375, B.R. 135, 141 (Bankr. E.D. Pa. 2007). Because the valuation of real property is less than exact science, courts are given wide latitude in determining value. *Patterson, supra, In re Windfelder*, 82 B.R. 367, 371 (Bankr. E.D. Pa. 1988). Accordingly, the Court finds the valuation opinion given by Mr. Keffalas to be clearly more credible and accurate than the one given by Mr. Karner. Even though some questions arise about the valuation figure provided by Mr. Keffalas that might conceivably justify an upward departure, the Court is satisfied that even if it were to do so the resulting value would remain well below the value of the U.S. Bank claim. For that reason, the Court accepts Mr. Keffalas' opinion of $155,000 as the appropriate value of the Debtors' residence.

An appropriate Order will issue.

Dated: May 18, 2009

_____
Thomas P. Agresti
United States Bankruptcy Judge

Court Administrator to serve:
  Ronda J. Winnecour, Chapter 13 Trustee
  Debtors
  Dai Rosenblum, Esq.
  Jodi L. Hause, Esq.